UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F I L E D
APR 2 7 2005
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-244-GWU

BRADLEY PRICE, PLAINTIFF,

VS. **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

* * * * * * * *

The plaintiff appeals the termination of Supplemental Security Income benefits which had originally been awarded to him as a child in 1991. The case is before the Court on cross-motions for summary judgment.

**STANDARDS APPLICABLE TO TERMINATION DECISIONS**

When the issue is the termination of benefits, the regulations establish the following eight-step test:

1. Is the beneficiary engaging in substantial gainful activity? If so, then the disability will be found to have ended. See 20 C.F.R. Section 404.1594(f)(1).

2. Provided the beneficiary is not engaged in substantial gainful activity, does the beneficiary have an impairment or combination of impairments which meet or equal the severity of impairments in the Listing? If so, then the disability must be found to continue. See 20 C.F.R. Section 404.1594(f)(2).

1

Price

3. If the beneficiary does not equal a listing, then the question is whether there has been medical improvement (any decrease in the medical severity of one's impairments, as per 20 C.F.R. 404.1594(b)(1)).

4. Provided medical improvement has occurred, then the question is whether this has produced an increase in the residual functional capacity. If the improvement is not related to the ability to perform work activities, then one proceeds to step 5. If the improvement is related work ability, then one proceeds to step 6. See 20 C.F.R. Section 404.1594(f)(4).

5. Provided there has been no medical improvement or the improvement is not related to work ability, then one must decide whether an exception to the medical improvement standard will apply. If not, then a finding of continuing disability should be made. See 20 C.F.R. Section 404.1594(f)(5).

6. If the medical improvement is found to be related to work ability or if an exception to the medical improvement standard applies, then one considers whether the current impairments in combination are severe. If so, then one proceeds to step 7; if not, the beneficiary is no longer considered disabled. See 20 C.F.R. Section 404.1594(f)(6).

7. If the impairments are found to be severe, then one must assess the beneficiary's ability to engage in substantial gainful activity in accordance with 20 C.F.R. Sec. 404.1561. If found capable of performing past relevant work, then the disability will be found to have ended. Otherwise, one proceeds to step 8. See 20 C.F.R. Section 404.1594(f)(7).

8. Provided the beneficiary cannot perform past relevant work, then one must assess the residual functional capacity and considering the age, education, and past work experience, determine whether other work can be performed. If so, then the beneficiary is no longer disabled. Otherwise, a finding of continuing disability should be made. See 20 C.F.R. Section 404.1594(f)(8).

The standard for judicial review is whether there is substantial evidence to

support the Secretary's decision that the plaintiff's condition has improved to the extent that he can perform substantial gainful activity. Casiano, Jr. v. Heckler, 746 F. 2d 1144 (6th Cir. 1984). The Court must determine from the record upon what conditions the claimant was awarded benefits, and whether there has been any improvement in these conditions. Id. at 1148.

## THE TERMINATION DECISION BEING REVIEWED

The administrative law judge found that the condition of Price, now an adult, had medically improved by October 1, 2001 to the point that he could perform jobs at the heavy, medium and light levels as identified by vocational expert (VE) testimony. (Tr. 15). Thus, the decision to terminate his benefits had been properly made. (Tr. 16).

## COMPARISON POINT EVIDENCE

In order to understand the comparison point, some review of the original award decision and the evidence underlying it is in order. A Disability Determination Rationale specifically indicated that Price had been awarded benefits with a primary diagnosis of a personality disorder and a secondary diagnosis of deafness. (Tr. 46).

As can be surmised from the fact that the primary diagnosis related to Price's mental condition, the vast majority of older records also essentially related to the plaintiff's mental status. Original records included school records prior to 1991; among those records was a teacher's questionnaire of October, 1990 describing

3

Price

Price as performing at a low level academically, being a slow learner and wearing bilateral hearing aids, but also being able to interact "typically" with peers, responding well to adults, and being able to perform better at school but seeming unmotivated by the educational experience. (Tr. 103-104). Grades in the fifth and sixth grades were mainly "D"s. (Tr. 106). A number of mental status evaluations were considered (Tr. 49)[1]: (1) John Wolaver's April, 1990 evaluation which indicated that Price's estimated IQ was 60-70, a depressive disorder could be diagnosed, an organic mental disorder and a psychotic disorder might be "consider[ed]", and passive/aggressive/dependent personality traits were present (Tr. 145), (2) a July, 1990 evaluation by Shelle Dietrich which suggested that Price had malingered on the IQ testing, but which concluded that the child had "estimated *borderline intellectual functioning*", a dependent personality disorder and a *GAF of 65*[2] (Tr. 155), (3) a psychiatric examination from Robert Dane, the report for which was received in March, 1991, which indicated that he was in agreement with Wolaver's findings and found Price an immature, dependent, culturally-deprived youngster with

---

[1] A March 7, 1990 report from a Dr. J. H. Sanders, which apparently was in the record upon initial consideration (Tr. 49), is not in the present transcript (Tr. 1-2). The plaintiff does not appear to place any focus on this omission, however.

[2] Scores between 51 and 60 are consistent with "moderate . . . difficulty in social, occupational or school functioning", and those between 61 and 70 are consistent with *"some mild symptoms . . . but generally functioning pretty well"* as per the Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) (DSM-IV).

4

Price

probable mental retardation and hearing loss (Tr. 168), and (4) James Leisenring's examination of the plaintiff in June, 1991, which found Price a withdrawn, passive/aggressive individual who exaggerated his limitations (Tr. 169-170) but who could be said to have an estimated borderline to low average intelligence, and possibly an oppositional disorder and a passive-aggressive personality disorder (Tr. 172).

As more of the aforesaid evidence relating to the mental health status was added to the record, the medical advisor opinion of the case changed. In November, 1990, the non-examining medical advisor evaluating the case opined that:

> While this young man may have malingered during. . .[a consultative examination, by Shelle Dietrich] two other evaluation sources [Wolaver and, presumably, the missing Sanders report] concluded mental retardation from their assessments. [Claimant] is in a regular class setting with slow learners, is essentially flunking out; has a high rate of absenteeism. Standard achievement scores from May, 1990 approximate a standard score of 75. Despite possible malingering, basis for denial is not established.. . .Would advise contact with [the claimant's] teacher for a fuller picture.

(Tr. 213). After the teacher's questionnaire was received, the advisor concluded that the child had not been disabled after all. (Tr. 214). Even later, in September, 1991, after Dane and Leisenring's findings were before him, he commented that

> evidence establishes substantial restrictions [secondary] to psychiatric impairment in this adolescent's age-appropriate function. While not of Listing level severity, [claimant's] condition does impose moderate

5

> restrictions to his academic achievement, to his social interaction and marked limits to his task completion capacity. He consistently fails to maintain acceptable levels of attendance. [Claimant's] mental impairments of comparable severity to that which would render an adult disabled.

(Tr. 219). This last document was seen as persuasive for the agency (Tr. 49) and no explicit reference was made to Kentucky Commission for Handicapped Children record documenting a moderately severe sensorineural hearing loss, albeit with speech and language skills reported as adequate. (Tr. 160).

Thus, the original records suggest that there had been a mixture of opinions about the plaintiff's mental condition and that his hearing problems were very clearly seen as a secondary condition.

## SUBSEQUENT EVIDENCE RELATING TO THE PLAINTIFF'S CONDITIONS

Evidence introduced for the period after he was originally awarded benefits but before the proposed cut-off date indicates that Price had been treated for gastrointestinal problems, but as of 1990, had not seen a doctor in 2 or 3 years, was generally seen as "healthy", and was on no medications. (Tr. 177, 179, 191).[3] At the time, although suffering from asymptomatic bradycardia, the record showed that an EEG, echocardiogram, repeat EKGs and a CT scan of the head were negative. (Tr.

---

[3]The claimant was reported by his mother to have multiple mental problems, but to spend his day playing "with his dogs, hunt[ing] and stuff like that all the time" and sometimes smoking marijuana. (Tr. 177).

6

Price

185, 190, 191, 192, 198). The only other suggestion from this period of treatment was the brief reference to the fact that Price was "obviously compromised with regard to intellectual functioning" (Tr. 177), although there was no mental health evaluation or treatment given at that time.

Nearer the proposed benefits cut-off date, the plaintiff underwent an audiometric evaluation by Albert Cullum. Cullum himself specifically stated that there had been a deterioration in hearing "since 1982" (Tr. 200) although no reference is made to the 1991 date upon which benefits had been awarded. A binaural hearing loss of 93.3 percent was reported. (Tr. 199). However, it is unclear the extent to which the plaintiff's hearing might be aided by a properly-functioning left ear hearing aid as it was described as "non-functional" at the time of the evaluation. (Id.) Additionally, since Price was described as "very cooperative" and understanding the procedures well, the extent his language and communication level were affected was unclear. Indeed, a later medical reviewer specifically opined that the evaluation had been inadequate in that nothing could be calculated from the figures given in the report[4] and that it would be better if a re-examination could be done by someone who did not know the plaintiff, as Cullum had personally known the claimant for about 20 years. (Tr. 236).

---

[4] Presumably, this was because his hearing scores were not necessarily reflective of the best corrected version of his hearing.

7

In September, 2001, audiological testing was performed. Test results, with one old hearing aid and an absent one on the other side, revealed a moderate to severe sensorineural hearing loss for the right ear and severe sensorineural hearing loss in the left ear. (Tr. 211). The old right ear hearing aid was found to have a faulty volume control; with the aid adjusted to comfortable loudness, Price showed only mild hearing loss and a lowered speech reception threshold, albeit with speech recognition ability only fair. (Id.). The examiner concluded that there was a severe bilateral sensorineural hearing loss and that Price was in need of new hearing aids. (Id.). After receiving this new information, the medical reviewer reported that the plaintiff's hearing impairment was not of Listing severity (Tr. 245) and that the only restrictions were to avoid even moderate exposure to noise (Tr. 241). Another medical reviewer later affirmed the sole physical function restriction which had been noted. (Tr. 246-253).

There is no record of treatment for any mental condition at any time after the plaintiff was awarded benefits, and he did not submit any mental health evaluations he had arranged. Rather, the only new mental health evidence of record is the report from Gary Maryman, who performed a psychological evaluation in June, 2001. He noted that the plaintiff did exhibit some hearing loss, but no sign of any anxiety or depression and was essentially oriented. (Tr. 205). He obtained IQ scores in the 60s, but the examiner did not believe these were a true measure of

8

his actual intellectual capacity (Tr. 207) and specifically stated that "it is highly unlikely in the professional opinion of the undersigned that this young man is indeed mentally retarded" (Tr. 206). Maryman further noted that "it became apparent fairly early in this examination that he had no intention or desire to take the examination seriously" (Tr. 205) and that the claimant even stated about his ability to work at the present time that "I don't want to, I guess" (Tr. 209). The only active diagnosis was of malingering, and a GAF score of 62 was noted. (Tr. 209). Maryman opined that Price did have sufficient intellectual ability to permit him to handle one to two step instructions and tasks, could maintain attention for simple, repetitive work within a reasonable time frame and across a routine work schedule, should have the ability to interact appropriately with fellow workers and supervisors, and should have the ability to adjust and adapt to stresses and pressures of a routine work environment. (Tr. 209-209).

Two medical reviewers examining the report concluded that the plaintiff currently had no medically determinable mental impairment. (Tr. 221, 255). This conclusion is also buttressed by the two audiologist's comments about the plaintiff's cooperativeness (Tr. 200, 211), made at a time when the plaintiff was alleging that he continued to be disabled due to a personality disorder (Tr. 283).[5]

---

[5] At the time of the administrative hearing, the plaintiff only focused on his back and hand conditions (Tr. 29), which had not been emphasized in any of the evidence of

9

Price

## CONCLUSION

Given the aforesaid evidence, [6] it appears a well-founded decision that there had been improvement in Price's conditions to the point he was able to function at the jobs identified through the use of the hypothetical questions given to the VE (Tr. 30-31). The decision will be affirmed.

This the __27__ day of April, 2005.

*G. Wix Unthank*
G. WIX UNTHANK
SENIOR JUDGE

---

record.

[6] There was other lay evidence from agency representatives as well which did not support the plaintiff's claim. For example, one hearing officer reported that the claimant, who reportedly had not worn hearing aids that day because they were "torn up", was able to understand all of the questions, even asked in a lowered voice (Tr. 69). The officer also reported having been told by a guard at the facility that he had seen Price "laughing and having a good time in the waiting" room, understanding a normal tone of voice, and being "all over" a girlfriend who had accompanied him. (Tr. 70).